**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

-----------------------------x
UNITED STATES OF AMERICA    :
  :
v.    :        No.3:06CR00073(AWT)
  :
MICHAEL FLOYD    :
-----------------------------x

## RULING ON MOTIONS TO SUPPRESS

Defendant Michael Floyd has moved to suppress as evidence a firearm seized by police from a vehicle he was operating. He has also moved to suppress as evidence a statement made by him to the police shortly after that firearm was seized. For the reasons set forth below, the motion to suppress the firearm is being denied and the motion to suppress Floyd's statement is being granted.

## I. FACTS

During the early morning hours on September 10, 2005, Officer Andre Rosedale of the Norwich Police Department was on patrol in a marked police cruiser. Officer Rosedale worked the midnight shift on a regular basis and knew that the closing time for bars in Norwich on Friday nights into Saturday mornings was 2:00 A.M. He also knew from past experience that shortly before and after the closing time for bars there was an increased incidence of individuals operating motor vehicles while intoxicated.

At approximately 1:49 A.M., Officer Rosedale observed a

motor vehicle driving on the double yellow dividing line on Norwich Avenue. After the vehicle turned onto Hunters Road, Rosedale activated his emergency lights and siren, and he signaled the operator of the vehicle to pull to the side of the road. The area where the vehicle pulled over is a two-lane road, one lane in each direction. It is basically at the bottom of a windy curve. The road has no sidewalks and is not well-lit. The vehicle was parked partially in the travel portion of the road and in a no parking area. Rosedale placed his cruiser at the rear of the vehicle.

Officer Rosedale learned that the operator of the vehicle was defendant Michael Floyd. In the front passenger seat was the defendant's girlfriend, Denisha Ross. In the back seat of the vehicle was a male juvenile, age 15. According to Ross, the defendant and the juvenile had picked her up shortly before the motor vehicle stop was made. When it was determined that there were three persons in the vehicle, Officer Michael McKinney was dispatched to assist Rosedale.

Ross had been drinking a fair amount prior to being picked up, and her recollection of events is fuzzy. The juvenile testified that when Floyd asked Officer Rosedale why he had been stopped, Rosedale replied "[b]ecause you were driving on the yellow line" and that Rosedale also conveyed that he "thought Floyd was drinking or something." Tr. 9/6/06 at 116, 127.

2

Floyd was cooperative and quite talkative at the time of the stop. In contrast, Ross and the juvenile were being quiet. At no time were there any hostile or combative words said by the defendant to any of the officers on the scene, or by any of the officers on the scene to the defendant.

Based on Officer Rosedale's observation of Floyd, Rosedale concluded that Floyd was not intoxicated. However, the defendant advised Officer Rosedale that he did not have a driver's license, nor did he have any other form of picture identification. Neither Officer Rosedale, nor either of the other two officers who came to the scene, knew defendant Floyd or had had any prior encounters with him.

Under the Norwich Police Department's policy, officers released operators issued motor vehicle infractions unless (a) the operator did not have picture identification and the operator's identity could not be confirmed after a reasonable effort to do so was made, and (b) permission for a custodial arrest was received from a supervisor. In addition, because (a) neither Ross nor the juvenile had a valid driver's license to drive the vehicle, and Ross was in any event intoxicated, (b) the owner of the vehicle, who otherwise could have asked that the car remain on the public street, was not present, and (c) the car was parked in an area that was not a safe place to leave a vehicle, the car had to be towed. The Norwich Police

Department's policy on towing provided that any vehicle which is a menace to traffic or public health or safety <u>shall</u> be towed.

Officer Rosedale asked the defendant if there was any type of contraband in the vehicle. The defendant advised Rosedale that there was no contraband, and invited Rosedale to search the vehicle.

Officer McKinney, who had arrived on the scene by that time, was talking with Ross, who was in the front passenger seat. Rosedale told McKinney that he would be stepping the driver out of the vehicle temporarily because the driver had given Rosedale permission to search the vehicle. McKinney also heard Floyd subsequently say, once Floyd was out of the vehicle, that the officers could go ahead and search the car because Floyd did not have any problem with that.

In Officer Rosedale's prior experience, it was not unusual for individuals who have contraband, such as guns, drugs or alcohol, in their vehicles to consent to a search and even invite the police to search. Rosedale decided to search the vehicle. Rosedale had Floyd step out of the vehicle and sit in the back seat of Rosedale's cruiser; the rear doors on that cruiser cannot be opened from the inside. McKinney had the two passengers get out of the vehicle and sit on the curb. Rosedale began to search the vehicle.

Sgt. Al Costa of the Norwich Police Department was serving

as the patrol supervisor in the early morning hours of September 10, 2005. He arrived at the scene of the motor vehicle stop while Rosedale was searching the vehicle.

While searching the interior of the vehicle, Rosedale found and seized a loaded .38 caliber Charter Arms revolver, bearing serial number 48878. It was located inside the middle arm rest of the back seat. When Rosedale found the weapon, he calmly and quietly alerted Costa and McKinney that he had found a gun. McKinney then began handcuffing Ross and the juvenile. McKinney testified to the effect that at this point both Ross and the juvenile were in custody. McKinney then started towards Rosedale's cruiser to put Floyd in handcuffs.

Rosedale asked, so as to be heard by everyone at the scene, who the gun belonged to. Initially none of the occupants of the car claimed any knowledge of the weapon. However, as Floyd, Ross and the juvenile were about to be removed from the scene, the defendant stated to the officers that he took responsibility for the weapon and it was his, and the defendant also asked that his girlfriend not be arrested.

As the result of these foregoing events, the defendant was charged with the following state offenses: Failure to Drive Right, Conn. Gen. Stat. § 14-230(a); Operation of a Motor Vehicle Without a License, Conn. Gen. Stat. § 14-36(a); Weapon in a Motor Vehicle, Conn. Gen. Stat. § 29-38; Criminal

Possession of a Pistol/Revolver, Conn. Gen. Stat. § 53a-217c;
and Risk of Injury to a Minor, Conn. Gen. Stat. § 53-21.

After the occupants of the car were removed from the scene,
the vehicle the defendant had been operating at the time of the
stop was towed from the scene at the direction of Sgt. Costa,
who was the supervisory officer on the scene.  Pursuant to the
Norwich Police Department's policy on seized vehicles, the car
was inventoried by Sgt. Costa at the auto yard to which it was
towed.  The middle arm rest compartment in the rear seat of the
vehicle, where the .38 caliber Charter Arms revolver had been
discovered by Officer Rosedale, is one of  areas of the vehicle
that in the normal course would have been searched during the
inventory.

Floyd was not advised of his <u>Miranda</u> rights until after he
arrived at the police station and was being booked.

## II.  DISCUSSION

### A. The Firearm

The temporary detention of a person during an automobile
stop by the police, even if only for a brief period and for a
limited purpose, constitutes a "seizure" under the Fourth
Amendment, and therefore must be reasonable under the
circumstances that existed at the time of the stop.  <u>See</u> <u>Whren
v. United States</u>, 517 U.S. 806, 809-10 (1996).  "[T]he police
officer must be able to point to specific and articulable facts

which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." Terry v. Ohio, 392 U.S. 1, 21 (1968). In evaluating the validity of such a stop, courts are to consider whether, in the light of "the totality of the circumstances," the detaining officer had a "particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981).

In the instant case, Officer Rosedale had an objectively reasonable basis for suspecting the vehicle's operator of criminal activity. Rosedale personally observed the manner in which the vehicle was being operated prior to deciding to pull it over. At an hour when there is an increased incidence of drunk driving because it is around closing time for bars in Norwich, the defendant's vehicle went onto or over the double yellow line. Thus, at a minimum, Rosedale had a reasonable suspicion, supported by articulable facts, that Floyd was driving while intoxicated, even though he later concluded that Floyd was not intoxicated.[1]

The defendant contends that his Fourth Amendment rights

---

[1]    Thus, the court does not need to reach the defendant's argument that the credible evidence shows that Floyd only drove onto, but not over, the double yellow lines and thus there was no basis for stopping him based on a belief by Rosedale that the defendant had committed the offense of Failure to Drive Right, Conn. Gen. Stat. § 14-230(a).

were violated when the vehicle he was operating was searched. However, "[i]t is well settled that a warrantless search does not violate the Fourth Amendment if 'the authorities have obtained the voluntary consent of a person authorized to grant such consent.'" United States v. Hernandez, 85 F.3d 1023, 1028 (quoting United States v. Elliot, 50 F.3d 180, 185 (2d Cir. 1995)); see also Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973) ("one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent"). "So long as the police do not coerce consent, a search conducted on the basis of consent is not an unreasonable search." United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995) (quoting Schneckloth, 412 U.S. at 228). Accordingly, a consent to search need only be voluntary, not fully knowing and intelligent. See Schneckloth, 412 U.S. at 235-36; Garcia, 56 F.3d at 422. In order for an individual's consent to be voluntary, it must be the product of free choice. See United States v. Wilson, 11 F.3d 346, 351 (2d Cir. 1993). Voluntary consent, however, need not be documented or declared expressly in words. Voluntary consent "need not be expressed in a particular form, but 'can be found from an individual's words, acts, or conduct.'" United States v. Deutsch, 987 F.2d 878, 883 (2d Cir. 1993) (quoting Krause v. Penny, 837 F.2d 595, 597 (2d Cir. 1988)).

Here, in response to Officer Rosedale's inquiry as to whether there was any contraband in the vehicle, the defendant not only advised Rosedale that there was no contraband in the vehicle but invited Rosedale to search the vehicle.[2] The defendant consented to the search of the vehicle and no Fourth Amendment violation occurred in connection with the seizure of the firearm.

In any event, because there was a valid inventory search in this case, the firearm would be admissible pursuant to the inevitable discovery rule. The Supreme Court has recognized that "inventory search[es] constitute[] a well-defined exception to the warrant requirement" of the Fourth Amendment. See Illinois v. Lafayette, 462 U.S. 640, 643 (1983) (citing South Dakota v. Opperman, 428 U.S. 364, 376 (1976)). An inventory search "does not rest on probable cause." Id. at 643. Instead, it is grounded on society's interests in safeguarding an owner's property that is taken into police custody, while protecting the police against claims of property loss and potential danger posed by unknown contents of a vehicle. See Colorado v.

---

[2] Defendant Floyd has argued that Rosedale was required to have independent reasonable suspicion to make this inquiry. Rosedale was not. See Muehler v. Mena, 544 U.S. 93, 101 (2005) ("We have held repeatedly that mere police questioning does not constitute a seizure. Even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual; ask to examine the individual's identification; and request consent to search his or her luggage.") (citations omitted)).

Bertine, 479 U.S. 367, 373 (1987); Opperman, 428 U.S. at 368;
United States v. Griffiths, 47 F.3d 74, 78 (2d Cir. 1995). An
inventory search is proper if predicated either upon
"standardized criteria" or upon an "established routine"
governing the circumstances and scope of such searches. Florida
v. Wells, 495 U.S. 1, 4 (1990). "[T]he inventory must be
conducted pursuant to 'established inventory procedures.'"
Griffiths, 47 F.3d at 78 (quoting Lafayette, 462 U.S. at 648).
"The existence of such a valid procedure may be proven by
reference to either written rules and regulations," or by
"testimony regarding standard practices." United States v.
Thompson, 29 F.3d 62, 65 (2d Cir. 1994).

Even where the police did not actually recover evidence
pursuant to an inventory search, such evidence is admissible
where the evidence shows that the evidence would have been
inevitably discovered pursuant to a valid inventory search.
See, e.g., Griffiths, 47 F.3d at 78; United States v. Perea, 986
F.2d 633, 644 (2d Cir. 1993); United States v. Gorski, 852 F.2d
692, 696-97 (2d Cir. 1988); see generally Nix v. Williams, 467
U.S. 431, 440 (1984) (inevitable discovery rule). To conclude
that evidence is admissible pursuant to the inevitable discovery
rule based on a valid inventory, the court must find:

> (1)  That the police had legitimate custody of the property
>      so that an inventory search would have been justified;
>
> (2)  That the police conducted the search according to

10

standardized procedures; and

(3)  That those procedures would have inevitably led to the discovery of the challenged evidence.

See <u>United States v. Mendez</u>, 315 F.3d 132, 138 (2d Cir. 2002).

Here, Floyd was taken into custody by Rosedale pursuant to the Norwich Police Department policy on in-custody motor vehicle offenses. Floyd did not have any identification, none of the officers at the scene knew him and Rosedale's superior, Sgt. Costa, was on the scene and in charge; the department's policy does not require officers to exhaust all possible means of confirming an operator's identity. Because defendant Floyd and the other occupants of the vehicle were all in custody and the vehicle in which they had been riding had to be towed to a local auto body shop under the Department's policy because it would have been unsafe to leave it where it was, Sgt. Costa was also authorized to search the vehicle pursuant to a lawful inventory search. He did so pursuant to the Department's policy. Even though the Norwich Police Department did not actually recover the firearm pursuant to the subsequent inventory search conducted by Sgt. Costa, the firearm would have been found during that inventory search because it had been in a location that was examined in the normal course during an inventory search.

**B.  The Defendant's Statements**

The Fifth Amendment requires that <u>Miranda</u> warnings be provided once a person has been arrested or is required to submit to a "custodial interrogation." <u>Miranda v. Arizona</u>, 384 U.S. 436, 444 (1966); <u>Oregon v. Mathiason</u>, 429 U.S. 492, 494 (1977); <u>Beckwith v. United States</u>, 425 U.S. 341, 345-46 (1976). "Custodial interrogation" means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Miranda</u>, 384 U.S. at 444.

In <u>Rhode Island v. Innis</u>, the Court concluded "that the <u>Miranda</u> safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." 446 U.S. 291, 300-01 (1980). That is to say, the term "interrogation" under <u>Miranda</u> refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. <u>See</u> <u>also</u> <u>United States v. Carmona</u>, 873 F.2d 569, 573 (2d Cir.1989); <u>United States v. Adegbite</u>, 846 F.2d 834, 838 (2d Cir.1988).

Although the exact sequence of all of the events that occurred after Rosedale found the firearm in the vehicle is unclear, Rosedale testified that once the gun had been discovered, he calmly and quietly alerted the other officers

that there was a weapon in the vehicle, and all three occupants were secured and then the weapon was secured.  Costa testified that when the handgun was recovered, the occupants of the vehicle were handcuffed and the gun was made safe.  McKinney testified to the effect that once he found out that Rosedale had discovered a gun, he began handcuffing Ross and the juvenile, and he believes that he then proceeded to Rosedale's cruiser and placed Floyd in handcuffs.  McKinney also testified that Rosedale asked out loud about the weapon and nobody said anything.  He testified further that Ross was in custody, in handcuffs and sitting on the curb, when Floyd made the statements about the gun being his and requesting that Ross not be taken to jail.  Thus it appears that Ross and the juvenile had been handcuffed, feet away from Floyd, who was in the back seat of Rosedale's cruiser, and McKinney was on his way to handcuff Floyd, if he had not already done so, by the time Rosedale got around to asking out loud about the gun.

If Rosedale's asking out loud about the gun was not express questioning, it was the functional equivalent.  At the time Rosedale put his question to Floyd, Ross, and the juvenile, Floyd had to understand that he was being taken into custody, if not already in custody.  Thus Rosedale's inquiry constituted a custodial interrogation, and it is undisputed that Floyd was not read his <u>Miranda</u> rights until after he arrived at the police

station.  Consequently, Floyd's statements about the gun being his must be suppressed.

**III.  CONCLUSION**

For the reasons set forth above, defendant Michael Floyd's Motion to Suppress (Doc. No. 28) is hereby DENIED, and his Motion to Suppress Statement (Doc. No. 45) is hereby GRANTED.

It is so ordered.

Dated this 25th day of October, 2007 at Hartford, Connecticut.

_____/s/AWT_____
Alvin W. Thompson
United States District Judge
